Good morning, your honors. Peter Johnson on behalf of Mr. Kelvin Darnell Woods, the appellant. May it please the court. The issue before the court is whether the government produced sufficient evidence that the weapon used during a robbery was a firearm. A firearm designed or capable of expelling a projectile by action of explosive. You think they left the $12,000 and took the toy gun? Yes, your honor. What sense does that make? The issue is whether the government has proved that the weapon used was designed to expel a projectile. Actually, the question is whether or not a rational jury could find that the government had proved it. That is correct. It's a somewhat different question. That is correct. Why is the testimony of all those witnesses that the gun looked real, it was being held as if it were heavy, it wasn't like a toy gun, it really looked so heavy in the guy's hand? And the fact that when the Confederates fled, they took the gun. Why would they take a toy gun and leave the money? There is nothing by any of the witnesses, the five witnesses, and nothing by the action that said this weapon was any more than a toy or replica. The court in Martinez-Jimenez... Yes, sir, it looked real. Yes, your honor. The look and feeling is not relevant to the issue of whether it is designed to expel a projectile. The specific nature of the gun. The look and feel refers to how they felt, and it's relevant only to the issue of 2113D, whether it was a dangerous weapon. When you look on the other hand as to whether it was designed to expel a projectile by action of explosive, that's a specific definition, and there's nothing in the testimony of the... My position is basically that unless they recover the weapon, you can't get a conviction. Unless somehow along the way, somebody stops and actually fires a projectile or tests the thing to make sure that it works. There are certainly ways to get a conviction, other than... If they recover the weapon, there's one, right? Yes. If they actually shoot it there on the scene, that's another pretty good indication. Yes. Okay. But let's say that neither of those things is the case. They don't recover the weapon, as happened in this case, and there's no discharge of the projectile, as in this case. What do you think would be enough? I have two answers. The first, just looking at the plain language... One good answer. I think they're both good answers. Okay. The first, just looking at the plain language of the statute, you need to look at the gun, handle the gun, and look at the inner workings of the gun. You're not answering my question. My question is, what would be enough? Let's say you don't have the weapon, you don't recover the weapon, and there's no evidence that it was shot. There's no one saying a bullet came out of it, right? Let's say those two pieces of evidence exist. What would be the evidence? I don't want to talk about the statute. What would be the testimony or the evidence that you would find sufficient? Someone that looks at the gun and finds that it is – well, looks at the gun during the robbery, is familiar with guns, and then testifies that this looks like a gun, as it didn't harass them. How about the guard here? The guard here was not a person that was experienced or familiar with guns, as the evidence in the record shows. He's the second day on his job, unarmed, and only said that he had seen a gun once before. When challenged more by the defense, he couldn't describe the make or the model of the gun, whether it was a semi-automatic or a revolver, or any details about that weapon. Under those circumstances, he's not familiar with the gun, cannot describe details with guns in general, cannot describe details about this specific gun. It's insufficient as a matter of – Let me just try to understand. I mean, you're saying if somebody is familiar with guns and looks at it and says – I don't know that I could tell one brand of gun from another. I don't know if I could tell a Smith & Wesson from a Ruger. I mean, I don't know how many people can do that. I'm sure there are people who can do that. But if – let's say you have somebody like that on the scene. You would still argue, would you not? Well, but he doesn't know that, in fact, this gun is capable – I mean, he may recognize it as a Smith & Wesson. He might even be able to give us the model number. But how can he testify that that particular gun is operational? Wouldn't you be arguing that? To a jury. And I think that this is a different question. Looking at the plain language of the statute, of course, but we're stuck with the cases by Harris and Westerdahl where there's not much analysis in the cases. And if you go back to the statute and you look at the language, you really can't tell. That testimony with even somebody familiar with guns that is capable of expelling a projectile by action of explosive. But here we don't even have testimony by a person familiar with guns. It doesn't even reach the level of Harris or Westerdahl. And that's the problem with the evidence in this case. I think that when you look at Jimenez-Martinez – Martinez-Jimenez, excuse me – the court noted the distinction between a dangerous weapon and the 924-C. Again, the dangerous weapon looks at the nature of the effect on the person, whether it's the wave in the air. And that testimony is relevant, of course, that these tellers in this case, that they thought it was a dangerous weapon. But when you turn, on the other hand, to the 924-C, the specific nature of the weapon, especially in a world today where they're confused, and a weapon could be anything under the definition of 924-C – a wallet, a flashlight, a pen, a belt buckle – that are designed or capable of expelling a projectile by action of explosive, you're looking at the specific nature of the weapon. And under those circumstances, looking at the entire record, there's no evidence related to the specific nature of the weapon here. With that, I'd like to remain the rest of my talk for the day. Were you trial counsel? Excuse me, Your Honor? Were you trial counsel? No, I was not, Your Honor. You might have got them off. Excuse me, Your Honor? Had you been, you might have got them off. Thank you, Your Honor. Good morning. Matthew Omhoffer on behalf of the government, and may it please the Court. In this case, the government presented the testimony of five different witnesses, four of whom described specific characteristics of the gun. The government also presented detailed digital photographs taken during the robbery surveillance photographs. And I do actually have – Was there a gun lineup? I'm sorry? Was there a gun lineup? Was there a gun lineup? No, there wasn't, Your Honor. So were they sort of put five photographs of guns and then had a policeman or somebody say, here's the real gun and here's the fake? One witness actually did look through a gun lineup and said it looked like this one, circled the revolver and said it looked like this one. But there was nothing to say that, you know, from the photograph, where somebody who is an expert in guns could have looked at the photograph and then maybe put that together with some photographs of fake guns and said this is the real one. Well, in fact, the defense expert in this case did look at the photographs and say, you know what, it looks like a .38 or a .375, excuse me, or a Colt Taurus 41. And so we actually have what we had in Harris, which is somebody familiar with guns looking at the gun, which is all that happened in Harris. It just so happens that the defense expert in this case was looking at a photograph and said this is what the gun looks like opined on guessed at the actual caliber of the gun. And so what I think here is that we have at least as much as we had in Harris and way more than we had at Westerdahl. Let's start with Westerdahl. A bunch of witnesses. The only comment this court made on the quality of the evidence and on a sufficiency challenge to a 924c conviction, this court actually said although there was some difference of opinion among the witnesses as to the type of gun possessed, there was no question that the government made the necessary showing that a real firearm was made. So this court has held that even when you've got a bunch of witnesses conflicting about the type of gun, there's no question still that if they believed it was a real gun, it's enough. You mean it doesn't matter whether it was a real gun? All that matters is whether people believed it was a real gun? It certainly does matter if it's a real gun, but I think the question is whether particularly here where we are on sufficiency. I don't know. Unlike Judge Kaczynski, I don't know much about guns. But if I said I don't really know the difference between a replica and a gun, I wouldn't tell the difference, but I believe this one was a real gun. That would be enough for conviction? That would be enough. And it was enough for the D.C. Circuit, Judge Scalia's decision in Parker. Well, I can understand, but this is the Ninth Circuit. Well, and the Second Circuit. And let's go to the Ninth Circuit in Westerdahl. If familiarity with guns was one of the required factors, you've got to have familiarity with guns, you'd think this Court would have said so. This Court said nothing about familiarity with guns in Westerdahl being required. Well, but isn't that sort of implicit? If you don't have familiarity with guns, what can you say about something? Well, I think what you can say is you can say the things that the witness has said here. They can talk about color. It was shiny? They can talk about color. It's shiny. But we know there are shiny replicas. Shiny, heavy, made out. And I think that the issue of the record about one of the things that it was heavy. Yes. Heavy in the hand. Is there any evidence that replicas are not heavy and real guns are heavy? Is that in the record? Well, no. Actually, it's true that the defense expert did opine that if something's made out of metal, that it's more likely than not a real gun. And so you had the defense expert helping us out. The defense expert also said that most guns are required to have, most replica guns are required to have the red nozzle on the front for safety reasons. This gun didn't have it in this case. The defense expert also said. Well, they wouldn't take something with a red nozzle in for bank robbery, for good reason. That's certainly correct. You think they have enough smarts to remove the red nozzle? You would hope they would. But here, according to the defense, they left behind the $12,000 and took the toy gun. But he had the toy gun. It was stuck in his waistband. I'm sorry? The gun was in his waistband. No, the gun was out. You may have seen the pictures. They're very detailed. It was out when he was doing it, but it came from the waistband. The gun started in the waistband. It came out. But there is evidence that the gun was. Yes, and therefore, that's where he kept the gun. So that if he put the gun back in the waistband and then he fled, it's understandable that the gun went with him. Well, they went in a car. They fled, went in a car, drove 2 1⁄2 blocks, and then got out and left behind money. And you thought he was waving the gun the whole time? He had the gun in his hand the entire time he was in the bank. While he was driving, he had the gun in his hand? We don't have. He wasn't driving. That person wasn't driving the car. There were three robbers. One other was driving the car. Which photograph do you say has the. . . I think the best photograph. And, again, I brought digital printouts, the photographs that the jury looked at. The ones that you have in the government's excerpt of records are a little tough. Well, pass them up. I'd be happy to. . . I apologize for not getting the details. We feel neglected in this case. I would point the court to, in the government's excerpt of records. . . Well, I don't know. I've just been handed a folder. Has the opposing counsel seen this? He's seen this. He's seen this. I presented this to him. Okay. So government's excerpt of records, 66, 67, and 68, or there. . . No, these are not by excerpt of records. There are seven, double M, double N, and double O. M, double. . . Actually, it's tabbed right there. So the yellow tab, you can go right to. . . My yellow tab starts at double M, right. Okay. So if you look at M, N, and O, those are some great pictures of the gun. Double N. . . Well, that's definitely a. . . No, I'm kidding. And this is the point here. To the extent that we have differing descriptions of the gun, there's no question as to at least one of the guns, what it looked like, what color it was. Two witnesses said it was black. Two witnesses said it was metal. One witness said it was heavy. I thought it was shiny. Well, one said it was metal. One said it was shiny. But that was a second gun. The witnesses said it was shiny. It was talking about a second gun that was taken, not this one that's pictured here, but that was taken into. . . So you have two guns here. Now we've got the odds that there's two replicas. The defense expert indicated that the technology of replicas had gone to such a point that unless, as Judge Kuczynski pointed out, you could examine the gun or it actually shot a bullet or projectile, you could not tell the difference between a replica and a real gun. If that's true, hasn't then technology gone past this particular statute so that unless you actually are handling the gun, you can't tell whether it's a real gun? I don't think so. The defense expert in this case said, you know, if you can't handle the gun, you can't know. But that's been the case in Westerdahl and in Harris, and even back as far as 20 years ago at defense sites, Martinez and Menez, where they opined about the possibility that fake guns look more and more like real guns these days. So that's 20 years ago, and Westerdahl and Harris were decided after that. So the technology's been there all along, Your Honor. And I think that this Court has really hemmed the defense in in Westerdahl and Harris in terms of. . . In fact, there's not a single court in this circuit or elsewhere, published or unpublished, that set a minimum threshold for what's required to prove a 924C conviction. You've got cases out of almost every circuit that deal with witnesses only, not a single picture. You've got cases from two different circuits. . . Judge Mikuta's question actually goes, can be taken even one step farther, because real guns now look a lot more like replicas. Have you seen the S&W 342 made of scandium or magnesium? I mean, there are two versions, and it's light as plastic, and it doesn't look at all like a gun, like a real gun. It looks like a toy. Well, and I think this gets to the other point, which is the inferences, the valid inferences that could be drawn. Not only the leave behind the gun, leave behind the 12,000, take the gun, but also the inference that was pointed to by the Second Circuit, which has been cited again and again by the D.C. Circuit and the Tenth Circuit. In Marshall, the Second Circuit, the court said, pointing a gun at somebody's face is tantamount to saying that if you don't do what they want you to do, you will expel a projectile, which is precisely what's. . . But how does that change the fact that it may be a replica? They don't want. . . It's not really a gun. You're trying to fool them. Well, replicas are handled quite differently, I think. If you look at Martinez-Menez. . . But you can point it at somebody. You can point it, but mostly they don't. Isn't the purpose of a replica to make the customer think it's a real gun? That's certainly true, but in Martinez-Menez, for instance, a replica was involved. He kept it at his side. You've got a lot of people who flash a gun like this through the belt. These people pointed a gun in the face of other individuals and said, do this or I will, and that's a valid inference. . . Because I think it's a valid inference, and I think because the Second Circuit and the D.C. Circuit have both drawn it, which is that, reasonable or not, and I think that we can certainly understand that that would be reasonable generally if circuits are drawing the inference, that if you point a gun at somebody. . . I have no idea what you're saying. It's the one long sentence you've lost me about. . . I apologize. I apologize. Do you understand Judge Reinhardt's question? I do. I do. Okay, why don't you try it again. The answer is that a number of circuits have said that if you're pointing a gun at somebody, you're saying you're going to shoot them, and a jury can draw a valid inference from that that if you're pointing a gun at somebody, you're saying you're going to expel a projectile. That's what the D.C. Circuit has said. Of course that's what you're saying. Big deal. But that's a valid. . . Of course that's what you're saying. It's a big deal because we're deferring to what the jury's done here. No, but the jury can perfectly well find that you're saying, I'm going to expel a projectile. You, in fact, might not because you haven't got the guts, or you might not because you're really a nice person, and don't want the money, and don't really want to hurt anybody, or you might not do it because you're afraid of getting caught and the consequences, or you might not do it because it turns out to be a replica, and you don't really have a bullet to shoot. For all those reasons, you, in fact, might be lying through your teeth when you say, I'm going to eject a projectile if you don't give me the money. Correct, but it's a valid inference for the jury to draw, which we have to defer to here. I don't understand why it's a valid inference. Let's assume there are two possibilities. You either have a replica that you want the juror to think is a real gun, and you want the customer to think it's a real gun, or you do have a real gun. Either way, you want the customer to think it's a real gun. So why is pointing it at them? Does that allow you to draw an inference that it's not a replica? Along with all the other evidence, I think it does take you a step further. Along with the witnesses saying it looks like a real gun. I know you think so, but I'm trying to find out why. Because one of the other reasons is because if you display a gun that closely, you give the person an opportunity to examine it and perhaps determine that, wait a minute, this is a plastic gun. So if you're pointing a gun at somebody's face, you're giving them an opportunity to examine it. Are all replicas plastic? No. There are some that are replicas. But I think what we're getting into is this idea that the government has to disprove a negative in its case, has to actually disprove. I think we all understand the government has to prove every element of the crime. Yes. So it needs to disprove nothing. The question really is whether it has established one element. And I think that if you look at Harris and you look at Westerdahl within the circuit, we're really well within the heartland. We're way above Westerdahl because we've got the digital pictures. And there were no pictures in Westerdahl and conflicting accounts. And the accounts in this case are strikingly consistent. You've got two people saying it was black. You've got a number of people saying what it was made out of. And you've got more than one gun. To me, it doesn't look black in this picture. Well, and I think that the First Circuit observed that gun metal looks both silver and black depending on the angle you look at it. And so I think that... Well, you're the one that's counting consistency as a virtue here. It doesn't do any good to say, well, you know, the First Circuit is saying inconsistencies are okay. Well, and this circuit said inconsistencies are okay. Well, what would that be? The gun would either be black or it would be silver. Nobody would come in and say it was a green gun or a purple gun, right? Well, I mean, perhaps not. But I think that these witnesses were saying what they saw. Well, let me ask you this. How often in your career as an AOC have you heard somebody say it was a purple gun? Certainly never in Canada. Has anybody ever testified that it's anything other than a black gun or a silver gun? But these are precisely the things that were testified to in Harris, for instance. This court credited the fact that they said the gun was made out of gun metal in Harris. And so we've got here people are saying the gun's black and made out of metal. I think what this explains is why they took the gun and left the money. It was probably such an expensive replica. It was worth more than the money. And probably more than one replica because there's more than one gun in that bank. And I think it makes a difference in this case that in Harris you've only got one gun. In Westerdahl you've only got one gun, conflicting accounts. What was the evidence in Westerdahl that you think is so insignificant compared to this? Well, what they said in Westerdahl, and this is the only discussion of the evidence in the case, was that a number of people saw it and there were conflicting accounts of what the gun looked like. Nevertheless, there's no question the government got over the hump. Is it all in this one paragraph that says here, although there was some difference of opinion among the witnesses as to the type of gun possessed, there's no question the government made the necessary showing. That's correct. So they don't tell you what the evidence is in Westerdahl. But to the extent that the defense specifically said here, we need evidence of the specific nature of the weapon. Well, you don't have it in Westerdahl. I'm talking about the evidence in Westerdahl. What was it? What did the witnesses testify to? You have no idea from Westerdahl. There's only one description of what the witnesses saw in Westerdahl, and that is that as the guys were driving away, a deputy saw somebody display a gun. Okay, that's all you've got. And you've got much more than that in this case. But you don't know what the testimony was. You don't know whether the deputy was asked, did you know it was a gun? How did you know it was a gun? What experience do you have with guns? How could you tell it wasn't a replica? We don't have any idea from Westerdahl what the testimony was. And I think if those facts were significant, familiarity, what kind of gun? There wouldn't have been a better opinion. They would have been mentioned in there. I think that's true because it was mentioned in there. You make a death of real interest. You always write excellent opinions. Well, I'm not suggesting that there's anything wrong with the opinion. I'm simply saying that. Well, I am. I'm telling you it doesn't support your case because it doesn't say anything. If you don't have the facts, this is written like a memorandum disposition and like one will be written after January 1st, where you can't tell anything from it. Well, and what I push the court to think about is also that we have everything that you had in Harris. So if you don't like Westerdahl, you can look at Harris. So if you look through Harris, you can see here's what they have. Bank employees testified that a robber had a gun and aimed it at a teller's face. Exactly what we have here. In fact, we have a photograph of one of the guns being pointed at a seven-month pregnant teller. It's pointed at children, pointed at a customer who walked into the bank and tried to get out. So we've got that. Surveillance photographs showing the robber pointing the gun at the face of a teller. That's what you have in Harris. That's what we have here. Very detailed surveillance photographs. Third, a bank customer looked closely at the gun, and the robber bumped him. Now, that's what we have here with Kabatagan. You have him looking closely at the gun, and a robber bumped him, and he said he felt the gun against his chest, and it felt hard. Third, you have a witness familiar with guns in Harris who said that the weapon was gunmetal and appeared to be either a .38 or a .45. Now, the defense says we don't have it here. We do. First of all, we have witnesses saying that the gun was made out of metal. Second of all, you have the defense's own expert saying that the gun looked like a .38 or a .357 Magnum or a Colt .41 Taurus. So we have absolutely everything we have in Harris. How about the hammer-cock language? And in that case, there's also the suggestion that the hammer was cocked. And the defense expert in this case said, I think the hammer's probably not cocked looking at the gun. So you've got everything, including evidence provided by the defense's own expert, that you have in Harris. And I think if you look at these pictures, it carries you even farther because there's no question of what the gun looked like. There's no question that it looked like a real gun, and there's no question that it had all the characteristics, the heaviness, the gunmetal, and the hole in the barrel, the shininess, all the things that we associate with a real gun. The hammer was cocked in a replica gun? Yes, it can. Yes, it can. I think that came out during the testimony. And so what you have here is you have everything we had in Harris in this case. And so I don't think that there's just no – I know the defense is trying to shoot the gap between Harris and this case, but there really is no gap in my view. You've got absolutely everything you have in Harris and more. And so if you look beyond the circuit, just to sort of make sure we're staying consistent with the other circuits, you've got case after case where it was sufficient, despite the fact that there was no familiarity with the evidence. You've got case after case where it's witness only, no surveillance photos of grass at all. One witness in many of these cases, the Third Circuit and the Fourth Circuit, is enough to convict somebody of a 924c count. And if you look at testimony about caliber, there's absolutely no testimony about the caliber of the weapon in Westerdahl. If that was important, I think it would be in there. Moreover, most of the circuits don't have any testimony about the specific nature of the weapon. And so if you look at the Tenth Circuit and you look at the Fourth Circuit and you look at the Sixth Circuit and the First and Second, across the board, familiarity with guns, caliber not required. Finally – Can you make a .38 automatic? I'm sorry? Can you make a .38 automatic? Can you make a .38 automatic? I'm not sure. I'm not sure. I don't think such a thing exists. The final thing I'd note is that if you look at the Tenth Circuit's decision in Tolles, I think it's right on point. You have a witness there who's very familiar with guns who said replicas look like real guns. I mean, he said it in that case. He had precisely what we have here in Tolles in the Tenth Circuit, which is evidence and one person familiar with guns saying replicas can look like real guns. Nevertheless, the Tenth Circuit held that the evidence was sufficient to support the 924c count. So I think that within the circuit and without, we're well within the heartland of the kinds of cases. Let's assume that your expert, the government expert, said there's no way to tell the difference between a replica and a real gun by just looking at it from a distance. Would that be enough to convict you? Yes, it would in light of everything else. That's not what you're arguing. That's what the Tenth Circuit said, right? It doesn't matter whether you can't tell whether it's a replica or a gun. No, I'm not sure that the Tenth Circuit said that. All I'm saying is that everybody agrees, and that's why I didn't call an expert, because my expert was going to say the same thing. You can't tell beyond to a scientific certainty whether the gun could fire a projectile or not by just looking at it. But we don't have to prove our case beyond to a scientific certainty and certainly on appeal. But suppose he said you can't really tell. Replicas these days really look like real guns. And that's what we had here. That's what we had here. That's the testimony we had here. So you really can't tell the difference by looking at it. Correct. But you've got all the— I'm a little curious about scientific certainty. I thought beyond a reasonable doubt was something akin to scientific certainty. Well, I think if you look at all the cases that have talked about scientific certainty, the D.C. Circuit, the First Circuit, the Tenth Circuit, and the Eleventh Circuit, they've all said that scientific certainty isn't required, and we're not— No, I think they may all be influenced by what Judge Kaczynski said at the beginning of this case, which is that you really, if you applied the statute properly, you really couldn't convict somebody unless you found the gun or unless you'd fired it. Because you can't prove it. You can prove it beyond a reasonable doubt because it's— because all the—particularly on appeal, we're drawing all the reasonable inferences in favor of the jury's decision, and all conflicting evidence gets resolved. So here you have a defense expert. The defense expert—the jury could have disbelieved the defense expert entirely. And I think, given the fact that it conflicted with what the witnesses say, we have to presume that they did on this level of deference on sufficiency of the evidence. So I don't think the defense expert coming in and saying replicas look like new guns— What I'm saying is why these other circuits have come to some of the conclusions they have. Because what you have told us, really, is that the reason you didn't call an expert is because the truth is that you can't tell the difference between a replica and a regular gun. All the witnesses who saw this gun know that it looked like a gun. It could have been a replica. It could have been a real gun. And that's all you can prove. And basically what you're saying is that's all the government has to prove. Well, that's what the cases say. That's what this circuit has said. That's what all the cases say. And I think that at this level of deference, we're drawing all the inferences in favor of the government. There was enough, particularly if you're looking just within the circuit at Westerdahl and Harris. I think there was plenty. I mean, you're also saying that although you can't tell without handling the gun, the jury can understand the use of the gun in context and make inferences as to the use of the gun or the replica, the item, and make a determination based on that. And that's where the cases seem to have allowed jury to infer from context. And that's precisely it. And the defense expert talked about this. If you see a gun in the waistband or in the belt of a police officer, the context matters. It's reasonable. It's very reasonable and certainly beyond a reasonable doubt that that's a real gun. If you see a gun on a movie set, it's probably beyond a reasonable doubt that it's a fake gun. So context matters, and the defense expert admitted that. Material matters. So what it's made out of matters. So you stack all these things up. That's true. But this is not a movie set and this is not a policeman. This is a bank robbery. And we know for a fact that there are many, many, many times that people use fake guns in community robberies. You have many cases like this. I've seen many cases like this where sometimes they have a banana in the waistband and nothing more. Sometimes they have things that look like guns but are in fact not guns. So we know that that happens with some regularity. So if context matters and if you know nothing else, then what you would say is, well, you know, in a significant number of times when this context arises, a non-real gun is used. Therefore, if you take a specific instance and know nothing else, there's a reasonable doubt as to whether in this particular instance the context supplies a real weapon of attack. The problem with that is that the FBI agent who had investigated hundreds of bank robberies in this case actually said that I've never seen a takeover bank robbery with a fake gun. I've seen individuals come in with fake guns, but I've never seen a takeover. And this was a takeover with a real gun. Excuse me, with a fake gun. All the ones that he's investigated have been real guns. So I think that the context does matter and it skews in the government's favor because this was a takeover bank robbery where you're really trying to make sure nobody moves, where you're going to the vault, and there's more than one gun. I think the jury had every reason to believe that, okay, maybe there's one fake gun in the bank, but two, and they both get taken and the money gets left behind. But if you're going to use fake guns, you wouldn't use just one. You would either make it a real gun bank robbery or you'd make it a fake gun bank robbery. There's no point in using a fake gun. The whole idea of using a fake gun is so you limit your exposure and sentencing and those kinds of things. Exposure and sentencing and also to avoid the accidental discharge of a weapon that might kill somebody and limit that risk. It makes no sense at all to say, well, we brought two guns in. We brought one fake and one real. So it's either all one or all the other. That's correct, and I think that given the fact that it's either all one or all the other, here we are on sufficiency of the evidence review. The government does not have to prove every, and this court has held, the government does not have to disprove every possible theory except guilt. All the government has to prove is that there was a rational basis for the jury to so conclude, and they really did. We're up to 15 minutes now. I'm sorry, I didn't mean to go on. Well, we're 50 minutes over. It's actually 25 minutes. All right, we'll let you keep going. We've been asking for some of that time back. Thank you very much. You can have it any time you want, Your Honor. Don't expect to get the same amount. I won't. Your Honor, I just have a few points. The first, one of the points the government made about its agent seeing 900 bank robbers, it's really taken out of context, and I think the court will look at the transcript. You'll see it. He said he investigated 900 bank robberies, but none of them, he didn't say anything about how many involved takeover robberies. One, two, or even zero. How many investigated? How many involved guns? How many was solved? So it's taken out of context, and that statement is irrelevant. The other points that I think the government made was that there are five witnesses. The five witnesses, whether it's 10, 20, 30 witnesses, they have to have some evidence, some evidence to show the specific nature of the weapon, whether it's designed to eject a projectile by action of explosive, and that wasn't there. I think that the court must look at Martinez Jimenez. In that case, there was a fake gun, but if you look at the facts in that case, the people that were familiar with guns thought it was real, and I think it's important that 20 years ago, where the court is emphasizing that you look at a gun and you may think that it's real, and then technology is getting better, where people noted that real guns are looking like fake guns, fake guns looking like real guns. I think, as well, the government looked at the photograph. Was there evidence in this case that the technology is improving and that they look more like real guns than they did in the past? The evidence was put on by the defense, and I know that the MSF... Did your witness testify that guns, replicas now look more like real guns than they used to? That technology is getting better, and I think that was, I don't want to misrepresent the record, but I know the witness did say this, that weapons are looking, they're made with the same metal, the same type. They're made to look like real guns, and I think that's important to look at and to examine. Another thing, as I was saying about the photographs, the government is focusing on the photographs, but again, the number of photographs doesn't matter. If the agent is looking at the photographs and he's saying, clearly, I can't tell whether it's a real gun or a fake gun, or whether, more importantly, whether it fits the definition of a firearm under the statute, that's not enough. And as well, we know that the tellers weren't looking at the pictures. The government also focused on the defense expert, but again, the court must be reminded that this is a Rule 29 motion, and it should be evaluated with the government's evidence, the evidence that the government put on. And when you look at it that way, there's no evidence related to the specific nature of the weapon. What we're asking the court is to really go back to the statute, to look at the language of the statute, and see whether it applies here. I know that many courts have looked at it and said, well, the government can't do this. But that's not the analysis that the court has to look at. The court shouldn't make excuses. If the government doesn't have the evidence or can't prove it, they shouldn't bring that charge. And it makes sense under the statute, particularly in this case. Under 2113D, there's an added enhancement penalty for carrying a dangerous weapon. And under 924C, it's a consecutive sentence. It's added on top of, because of the dangerous nature of the weapon. Because if it's specifically designed to expel a projectile, it may accidentally go off, as Your Honor has stated. And a toy wouldn't, that wouldn't happen in the context of a toy. So we're asking the court to go back and look at the statute. And when you look at the statute, you'll see that the evidence is insufficient. And even looking at the cases that the government cited. In Westerdahl, there was a deputy sheriff that was at the scene, assuming that he's familiar with guns, that actually fired a shot at the individual. That didn't happen here. There was someone in Westerdahl familiar with the, with weapons. That within their reason, it can be assumed that the court was looking at, within their reason, thought it was a real gun. In Harris, I think the government is running from the person that, from the facts in that case. A person was familiar with guns. They showed one that, they talked about the caliber of the gun. In fact, they, excuse me? I think they got it wrong. They may have. But I, I mean, that's, that's a, that's, we're nowhere, we're nowhere even near the, the evidence that was presented in Harris. The fact that there was a hammer cocked in that case. And that it, that it looked real. In this case, it was all conflicting evidence. Some witnesses said they didn't even see a hole in the end of the gun. Another witness said, I didn't know, notice that small thing on the back when, when referencing a hammer. Some people talked about a semi-automatic. And some people talked about a revolver. Some people talked about it being black or silver or different colors. When there's inconsistent evidence, and when people are unfamiliar with guns, I think the court needs to look back at the statute. And see whether there was any evidence to say that it was capable of project, of expelling a projectile. And under these circumstances, we're asking the court to vacate the conviction under 924C. Case that's argued will be submitted. Let me just comment on what an excellent argument we have from both counsel. It's really always a great pleasure to have such fine advocates. And such good questioning from the court, too. What's the point of good questioning if you don't, if you don't have good advocates to respond to them? I think you all should go out and have lunch together. And settle a case. Oh, no, I don't know whether it can be settled. But you have both a reason to be proud. Do you want your notebook back, by the way? If you'd like to examine it more closely. No, no, I think we've seen enough. Next case in the calendar for oral argument is United States v. Brussais.
judges: Reinhardt, Kozinski, Ikuta